IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 13, 2011 Session

## RACHEL LEE EX REL. REBECCA LEE v. MARK EMKES,[1] COMMISSIONER OF THE TENNESSEE DEPARTMENT OF FINANCE AND ADMINISTRATION

### Appeal from the Chancery Court for Davidson County
No. 07-1812-III    Ellen H. Lyle, Chancellor

### No. M2010-01909-COA-R3-CV - Filed June 27, 2011

Petitioner, when she was thirteen years old, was having difficulty eating because of the position of her teeth, which also irritated her lips and cheeks. An orthodontist recommended braces to remedy the problem; however, the Tennessee Department of Finance and Administration denied TennCare coverage for orthodontic braces. Upon review by the Davidson County Chancery Court, the court found that the TennCare regulations impermissibly required both a Salzmann Index score of 28 and an abnormal dental development, i.e., a handicapping malocclusion, to qualify for orthodontic treatment, and that the Salzmann Index was an illegal utilization control because it nullified eligibility based upon an individualized review. The trial court also found that petitioner had not demonstrated a handicapping malocclusion, which is a valid utilization control under the regulations, therefore, she did not qualify for braces. Petitioner appealed. We affirm the trial court's finding that the TennCare regulation in effect at the time impermissibly required a Salzmann Index score of at least 28 to qualify for orthodontic treatment. The record does, however, establish that an individualized assessment of Petitioner's condition to determine whether she had a handicapping malocclusion was conducted by a consulting dentist employed by the agency, which satisfies the federal requirements. Accordingly, we affirm the trial court's decision to affirm the agency's denial of orthodontic braces.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

---

[1]Commissioner Emkes has been substituted as a party in the place of Commissioner David Goetz in accordance with Tenn. R. App. P. 19(c).

David Kozlowski, Columbia, Tennessee, for the appellant, Rachel Lee.

Robert E. Cooper, Jr., Attorney General and Reporter, and Shayna Abrams, Senior Counsel, for the appellee, Mark Emkes, Commissioner, Tennessee Department of Finance and Administration.

## OPINION

This action arises from the denial of coverage for orthodontic braces to a thirteen-year-old girl,[2] Rachel Lee, by the Tennessee Department of Finance and Administration, Bureau of TennCare ("TDFA"). An orthodontist, Dr. Jay Hight, requested preauthorization for coverage of orthodontic braces from Doral Dental, the contracted dental care provider for TennCare, on December 29, 2005. His request stated that orthodontic braces were requested because Rachel had "difficulty eating because of the position of her teeth" and because her lips and cheeks became irritated when chewing. In support of his request, Dr. Hight submitted OrthoCAD photographs of Rachel's mouth.

The day following the request, on December 30, 2005, Dr. Thomas Gengler, a dental benefits reviewer employed by Doral Dental, reviewed Dr. Hight's request. This review involved the completion of a Malocclusion Severity Assessment to determine Rachel's Salzmann Index Score, which Dr. Gengler determined to be 22. The minimum score for coverage was 28; thus, Rachel's assessment was stamped "Salzmann Score Fails to Qualify." A letter dated the same day was sent denying Rachel's request for braces. The letter stated the following reason for the denial:

> The study models indicate that the top front teeth have a space between them and some other teeth in the arch also are not in line; however, the conditions are not severe enough to qualify as a handicapping malocclusion. The information provided indicates that there is good dental health and there are no problems chewing, eating or speaking.[3] There is no medical necessity for orthodontic treatment.

---

[2]The TDFA refers in its brief to the child's age as eighteen. However, the pertinent age is not as of the time of the appeal, but the age as of the denial of coverage for orthodontic braces.

[3]It is unclear from the record from what information this statement was derived as the only information submitted was Dr. Hight's request, which provided the request was based on pain when eating and difficulty eating, and the OrthoCAD photographs.

On January 26, 2006, an appeal was filed on behalf of Rachel. Thereafter, on February 2, 2006, a second Doral Dental benefits reviewer, Dr. N. Knight, reviewed Rachel's OrthoCAD photographs and scored Rachel a 22 on the Salzmann Index, which resulted in the second denial of her request. A letter was sent, which reiterated the reasons stated in the previous denial letter. The letter further stated "Doral is not required to pay for braces if you do not have a handicapping malocclusion."

On February 7, 2006, Dr. Roy Berkon, DDS, a TennCare consultant, reviewed Rachel's file. In his report, Dr. Berkon concluded that Rachel had a class I malocclusion with a normal overbite and normal overjet. He determined there was minimal crowding in the lower anteriors, but excessive crowding in the maxillary anteriors. The report concluded with Dr. Berkon's decision stating the denial of orthodontic braces should be upheld. On February 17, 2006, TennCare sent a letter denying coverage. Dr. Berkon stated his Salzmann Index score for Rachel would be a 21. On February 22, 2006, Dr. Berkon reviewed Rachel again using x-rays, which he had requested after his first review; however, his opinion that braces were not medically necessary did not change.

A contested case hearing was held on January 30, 2007, before an administrative law judge. Rachel, Rachel's mother, Dr. Hight, and Dr. Berkon all testified. Rachel testified that she had occasional pain when chewing and that she had difficulty eating meat and hard candy. Dr. Hight testified that Rachel had difficulty eating due to her maxillary teeth. He also observed during his examination of Rachel that her cuspid teeth were erupted high and pointed straight out and that one of her lower bicuspid teeth had insufficient space to erupt and was "entrapped subgingivally." He stated that orthodontic treatment was necessary to alleviate the pain Rachel complained of when chewing.[4] Dr. Hight stated his recommended course of treatment for Rachel was removal of four teeth, application of full orthodontic appliances, and a prescribed course of comprehensive orthodontic treatment.

In contrast, Dr. Berkon stated that based upon his examination of the OrthoCAD photographs and x-rays, Rachel had crowding in the lower anterior teeth and upper teeth, upper cuspid eye teeth that were erupting and vertical, and a lower tooth that needed extraction. However, Dr. Berkon stated that he could not ascertain why Rachel was experiencing pain and irritation. Dr. Berkon stated the basis for the denial was that "[u]nder the TennCare rules a score less than 28, no open bites, no cross bites, no impinging overbite and, at the present time, . . . no handicapping."

---

[4]There was also minimal evidence introduced that Rachel suffered from a speech problem that could be addressed by orthodontic treatment.

Dr. Berkon also testified to the procedure used to determine medical necessity. He stated that he first ascertains if there is a situation that would cause speech problems, discomfort, or pain. Then, he looks to see if there are any open bites or early tooth loss. Last, he looks at the Salzmann Index. Dr. Berkon stated that there are situations in which a person who scored less than a 28 on the Salzmann Index would be approved for braces such as "handicapping situations" where there are impacted teeth, cross bites, open bites, or impinging over bites.

On April 24, 2007, the administrative law judge upheld TennCare's decision to deny coverage for orthodontic braces because Rachel did not have a handicapping malocclusion or any other condition that would qualify her for coverage under TennCare's rules. The judge found that while Rachel did suffer from pain and difficulty chewing, she did not have a nutritional deficiency or a palatal tissue laceration, and that while Rachel had a noticeable speech problem, she did not prove that her speech problems were due to the conditions of her teeth. Therefore, she did not qualify for coverage as she did not have a handicapping malocclusion or any other condition covered by the TennCare regulations. The order of the administrative judge became a final order.

On August 13, 2007, Rachel's mother filed a petition for review on her behalf in the Davidson County Chancery Court. A motion to dismiss was filed by TDFA, the dismissal was granted, and this court reversed the dismissal and remanded it to the chancery court in *Lee v. Tenn. Dep't of Finance and Admin.*, No. M2008-02029-COA-R3-CV, 2009 WL 2214023 (Tenn. Ct. App. July 24, 2009). On August 2, 2010, the chancery court issued its Memorandum and Order upholding the denial of orthodontic braces. The chancery court found that under TennCare regulations both an abnormal dental development, i.e., a handicapping malocclusion, and a Salzmann Index score of 28 are required in order to qualify for orthodontic treatment. The court found that the use of the Salzmann Index was an illegal utilization control because it was used as a substitute for individualized review. However, the court found that since Rachel had not demonstrated a handicapping malocclusion, which was a threshold requirement under the regulation, she did not qualify for treatment and the denial of treatment should be upheld. Petitioner filed a timely appeal.

**ANALYSIS**

I.
STANDARD OF REVIEW

Judicial review of decisions of administrative agencies, when those agencies are acting within their area of specialized knowledge, experience, and expertise, is governed by the narrow standard contained in Tenn. Code Ann. § 4-5-322(h) rather than the broad

standard of review used in other civil appeals. *Willamette Indus., Inc. v. Tennessee Assessment Appeals Comm'n,* 11 S.W.3d 142, 147 (Tenn. Ct. App. 1999) (citing *Wayne County v. Tennessee Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 279-80 (Tenn. Ct. App. 1988)).

The trial court may reverse or modify the decision of the agency if the petitioner's rights have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1)     In violation of constitutional or statutory provisions;
(2)     In excess of the statutory authority of the agency;
(3)     Made upon unlawful procedure;
(4)     Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5)(A) Unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Code Ann. § 4-5-322(h)(1)-(5)(A).  However, the trial court may not substitute its judgment concerning the weight of the evidence for that of the Board as to questions of fact. Tenn. Code Ann. § 4-5-322(h)(5)(B); *see also Jones v. Bureau of TennCare*, 94 S.W.3d 495, 501 (Tenn. Ct. App. 2002).  The same limitations apply to the appellate court. *See Humana of Tennessee v. Tennessee Health Facilities Comm'n*, 551 S.W.2d 664, 668 (Tenn. 1977) (holding the trial court, and this court, must review these matters pursuant to the narrower statutory criteria).  Thus, when reviewing a trial court's review of an administrative agency's decision, this court is to determine "whether or not the trial court properly applied the . . . standard of review" found at Tenn. Code Ann. § 4-5-322(h). *Jones*, 94 S.W.3d at 501 (quoting *Papachristou v. Univ. of Tennessee,* 29 S.W.3d 487, 490 (Tenn. Ct. App. 2000)).

II.
APPLICABLE FEDERAL AND STATE STATUTES AND REGULATIONS

A brief overview of the applicable federal and state statutory and regulatory provisions is pertinent to our analysis of this issue. The federal program commonly known as "Medicaid" was established by an amendment to the Social Security Act known as the "Medicaid Act" contained in Title XIX. *See* 42 U.S.C. § 1396 *et seq.* "Medicaid is a cooperative federal-state program through which the federal government provides financial aid to states that furnish medical assistance to eligible low-income individuals." *Semerzakis v. Comm'r of Soc. Serv.*, 873 A.2d 911, 918 (Conn. 2005) (quoting *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 585-86 (5th Cir. 2004)). States receiving funds from the federal government under the program must comply with federal statutes and regulations. *Id*; *see*

*also Markva v. Haveman*, 317 F.3d 547, 550 (6th Cir. 2003). The Tennessee Department of Finance and Administration is the Tennessee state agency that administers the Medicaid program in Tennessee, known as TennCare. Tenn. Code Ann. § 71-5-104; Tenn. Exec. Order No. 23 (Oct. 19, 1999).

Pursuant to the Medicaid Act, TennCare enrollees under 21 years of age are entitled to coverage for medical and dental services under the federal Early and Periodic Screening, Diagnosis and Treatment ("EPSDT") program. 42 U.S.C. § 1396d(a)(4)(B); Tenn. Comp. R. & Regs. 1200-13-13-.04(13). The EPSDT program is a comprehensive child health program which is designed to "assure the availability and accessibility of health care resources for the treatment, correction and amelioration of the unhealthful conditions of individual medicaid recipients under the age of twenty-one." *Semerzakis*, 873 A.2d at 918 (quoting *S.D. ex rel. Dickson*, 391 F.3d at 585-86). "A principal goal of the program is to 'assure that health problems found are diagnosed and treated early, before they become more complex and their treatment more costly.'" *Id*. (quoting *S.D. ex rel. Dickson*, 391 F.3d at 585-86). The stated purpose of this program is to provide enrollees under 21 years of age "[s]creening and diagnostic services to determine physical or mental defects in recipients" and "[h]ealth care, treatment, and other measures to correct or ameliorate any defects and chronic conditions discovered." 42 C.F.R. § 440.40(b)(1)-(2).

Pursuant to the EPSDT program, at a minimum, dental services should be provided for "the relief of pain and infections, restoration of teeth, and maintenance of dental health." 42 U.S.C. § 1396d(r)(3)(B). Dental care is defined by federal regulations as "diagnostic, preventive, or corrective procedures . . . including treatment of . . . [t]he teeth and associated structures of the oral cavity" and the treatment of any "[d]isease, injury, or impairment that may affect the oral or general health of the recipient." 42 C.F.R. § 440.100(a)(1)-(2). Nevertheless, states are permitted to "place appropriate limits on a service based upon such criteria as medical necessity or on utilization control procedures." 42 C.F.R. § 440.230(d).

To provide guidance to states on the program and its coverage, the Centers for Medicare and Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services, published the State Medicaid Manual.[5] The State Medicaid Manual states the EPSDT program includes orthodontic treatment "when medically

---

[5]Courts have held that the State Medicaid Manual is entitled to "respectful consideration in light of the agency's significant expertise, the technical complexity of the Medicaid program, and the exceptionally broad authority conferred upon the Secretary under the Act." *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 591 n.6 (5th Cir. 2004) (citing *Wis. Dep't of Health & Family Servs. v. Blumer,* 534 U.S. 473, 497 (2002) (citing *United States v. Mead Corp.,* 533 U.S. 218 (2001); *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504 (1994); *Schweiker v. Gray Panthers,* 453 U.S. 34, 43-44 (1981))).

necessary to correct handicapping malocclusion." CMS, State Medicaid Manual, § 5124.B.2.b (2005), available at http://www.cms.gov/Manuals/PBM/itemdetail.asp?filterType =none&filterByDID=-99&sortByDID=1&sortOrder=ascending&itemID=CMS021927&i ntNumPerPage=10.

Tenn. Comp. R. & Regs. 1200-13-13-.01(65) (Dec. 2005) defines medical necessity as follows:

> Medically necessary shall mean services . . . provided by . . . [a] health care provider that are required to . . . treat a TennCare enrollee's illness or injury and which are:
>
> > (a) Consistent with the symptoms or diagnosis and treatment of the enrollee's condition, disease, ailment, or injury; and
> > (b) Appropriate with regard to standards of good medical practice; and
> > (c) Not solely for the convenience of an enrollee, physician or other provider; and
> > (d) The most appropriate . . . level of services which can safely be provided to the enrollee. . .
> > (e) When applied to TennCare Medicaid enrollees under twenty-one (21) years of age, services shall be provided in accordance with EPSDT requirements. . .

TennCare's regulation addressing the coverage of orthodontic services under the EPSDT program states:

> Orthodontic services must be prior approved and are limited to individuals under age 21 requiring these services:
>
> (1) because of a severe handicapping malocclusion or another developmental anomaly or injury resulting in severe misalignment or severe handicapping malocclusion of teeth, documented by at least 28 points on the Salzmann Scale, or any other method that is approved by TennCare; or
>
> (2) following repair of an enrollee's cleft palate.

Tenn. Comp. R. & Regs. 1200-13-13-.04(1)(b)6 (Dec. 2005).[6] The definition of handicapping malocclusion is set forth at Tenn. Comp. R. & Regs. 1200-13-13-.01(39) (Dec. 2005) and states:

> Handicapping malocclusion, for the purposes of determining eligibility under these regulations shall mean the presence of abnormal dental development that has at least one of the following:
>
> > (a) A medical condition and/or a nutritional deficiency with medical physiological impact, that is documented in the physician progress notes that predate the diagnosis and request for orthodontics. The condition must be non-responsive to medical treatment without orthodontic treatment.
> >
> > (b) The presence of a speech pathology, that is documented in speech therapy progress notes that predate the diagnosis and request for orthodontics. The conditions must be non-responsive to speech therapy without orthodontic treatment.
> >
> > (c) Palatal tissue laceration from a deep impinging overbite where lower incisor teeth contact palatal mucosa. This does not include occasional biting of the cheek.
>
> Anecdotal information is insufficient to document the presence of a handicapping malocclusion. Anecdotal information is represented by statements that are not supported by professional progress notes that the patient has difficulty with eating, chewing, or speaking. These conditions may be caused by other medical conditions in addition to the misalignment of teeth.

In addition to federal and state regulations, TennCare's coverage of EPSDT services is covered by a federal judicial consent decree, which provides:

> Defendants shall ensure that, within their respective spheres of responsibility, TennCare, the MCOs and DCS provide children all medically necessary

---

[6]For purposes of this appeal, we shall use the 2005 version of the regulation, which was in place at the time of the administrative hearing. This regulation has been amended numerous times subsequent to the hearing and currently appears at Tenn. Comp. R. & Regs. 1200-13-13-.04(b)(5). This regulation differs from the regulation addressed in this court's recent opinion, *Fuller v. Emkes*, No. M2010-01590-COA-R3-CV, 2011 WL _____ (Tenn. Ct. App. _____).

EPSDT services as listed in 42 U.S.C. § 1396d(a) and as defined in corresponding Medicaid regulations.

*John B. v. Menke*, No. 98-0168, Consent Decree for Medicaid-Based Early and Periodic Screening, Diagnosis and Treatment Services (M.D. Tenn. Mar. 11, 1998), available at http://www.state.tn.us/tenncare/forms/johnb031198.pdf.

III.

DENIAL OF PETITIONER'S REQUEST FOR ORTHODONTIC BRACES

On appeal, Rachel ("Petitioner") contends that TennCare's regulation regarding orthodontic treatment under the EPSDT program impermissibly restricts coverage to when a "handicapping malocclusion" is present, which violates the federal statutes and the broad scope of the federal EPSDT program.

In contrast, TDFA argues that its regulations are consistent with federal law, which have "clear and express limitations on orthodontics," and that the chancery court correctly concluded that the State Medicaid Manual, published by the Centers for Medicare and Medicaid Services, specifically limits orthodontic braces to handicapping malocclusions. TDFA further contends that TennCare's regulations, and its interpretation of these regulations, is consistent with the recommendations in *Chappell by Savage v. Bradley*, 834 F. Supp. 1030 (N.D. Ill. 1993), and *Semerzakis v. Comm'r of Social Services*, 873 A.2d 911 (Conn. 2005), two cases which address orthodontic coverage under the EPSDT program.

In *Chappell*, a federal district court addressed whether the standard used by Illinois to determine eligibility for orthodontic care under the EPSDT program was in violation of federal law. *Chappell*, 834 F. Supp. 1030. The Illinois plan limited orthodontic services to children with "severe handicapping malocclusions," and the Salzmann Index was used to determine the severity of the malocclusion. *Id*. at 1031-32. In order for orthodontic treatment to be authorized, a child had to score a 42 or above on the Salzmann Index. *Id*. at 1032. However, children scoring below a 42 were occasionally granted approval for orthodontic treatment if a dental consultant determined the child had a severe handicapping malocclusion. *Id*. The two plaintiffs, both of whom were denied orthodontic treatment when they scored below a 42 on the Salzmann Index, filed suit contending that the requirement of a threshold score of 42 on the Salzmann Index before treatment was authorized violated federal law. *Id*. at 1032-33. The federal district court, ruling on cross-motions for summary judgment, held that there was a genuine issue of material fact regarding the procedure used by Illinois to determine eligibility for orthodontic treatment. *Id*. at 1035. The court stated, "[i]f the standard is whether orthodontic treatment is medically necessary for the eligible child, the standard will pass muster . . . [i]f the standard is solely a Salzmann Index score of 42 without regard

to the need for medical treatment, then there is [a] violation of the Medicaid Act." *Id*. In a subsequent order to clarify its previous ruling, the district court stated:

> To comply with federal law the IDPA must authorize orthodontic treatment to all eligible patients having handicapping malocclusions severe enough to have a medical need for such orthodontic treatment. The IDPA need not provide orthodontic care to eligible patients having handicapping malocclusions if such conditions are not severe enough to have a medical need for such orthodontic treatment.

*Chappell v. Wright*,[7] No. 91-C-4572, 1993 WL 496700, at *1 (N.D. Ill. Nov. 24, 1993). The district court's ruling in *Chappell* makes it clear that the use of the Salzmann Index score alone to determine eligibility for orthodontic care is improper and that the ultimate determination must be whether the braces are medically necessary.

In *Semerzakis v. Comm'r of Social Services*, the Connecticut Supreme Court addressed whether the Connecticut regulation on orthodontic coverage under the EPSDT program was a reasonable utilization control. *Semerzakis*, 873 A.2d 911, 913. Under the Connecticut regulation, orthodontic treatment was deemed medically necessary *per se* with a Salzmann Index score of 24 or more points. *Id*. at 915. If the score was under 24 points, the regulation provided:

> [T]he analysis proceeds to a second step whereby "the [d]epartment shall consider additional information of a substantial nature about the presence of other severe deviations affecting the mouth and underlying structures. Other deviations shall be considered to be severe if, left untreated, they would cause irreversible damage to the teeth and underlying structures." *Id*. The regulation also states that "[i]f the total score is less than twenty-four . . . points the [d]epartment shall consider additional information of a substantial nature about the presence of severe mental, emotional and/or behavior problems, disturbances or dysfunctions" that are related to the "dentofacial deformity" if "orthodontic treatment is necessary and . . . will significantly ameliorate the problems."

*Id*. (alterations in original). The plaintiff filed suit on behalf of her daughter who was denied orthodontic treatment when she scored less than 24 on the Salzmann Index and therefore orthodontic treatment was determined not to be medically necessary. *Id*. at 915. The plaintiff

---

[7]The name of the parties differed from the court's first opinion because a new commissioner of the Illinois Department of Public Aid was appointed in the pendency of the litigation.

contended that the Connecticut regulations were more restrictive than the federal scheme addressing the EPSDT program allowed. *Id*. Plaintiff's argument relied on 42 U.S.C. § 1396d(r)(5), which states that a state must provide such other necessary health care to correct or ameliorate defects whether or not such services under the state plan, for the contention that the state must provide orthodontic care regardless of restrictions in its regulations if the treatment is medically necessary. *Id*. at 916. The trial court agreed and the state filed an appeal. *Id*.

On appeal, the Supreme Court of Connecticut first addressed the application of 42 U.S.C. § 1396d(r)(5). *Id*. at 920. The court held that § 1396d(r)(5) did not require the state to conduct a separate medical necessity analysis from the analysis required under the regulation covering dental services, because dental services were specifically governed by § 1396d(r)(3). *Id*. The court held, however, that *"medical necessity remains the touchstone for the provision of services under either subdivision (5) of § 1396d(r) or subdivision (3)."* *Id*. at 921 (emphasis added). The court held that states were permitted to use "utilization controls" in order to determine if requested services were medically necessary. *Id*. (citing H.R. Rep. No. 101-247, 101st Cong., 1st Sess. 399 (1989), reprinted in 1989 U.S.S.C.A.N. 1906, 2125) ("There is nothing in the text or legislative history of subdivision (5) that precludes states from using utilization controls to determine whether requested services are medically necessary."). However, the utilization controls *must* be "consistent with the preventive thrust of the EPSDT program." *Id*. (quoting H.R. Rep. No. 101-247, 101st Cong., 1st Sess. 399 (1989), reprinted in 1989 U.S.S.C.A.N. 1906, 2125).

The court then addressed whether the Connecticut regulation was invalid because it was more restrictive than permitted by the federal medicaid statutes and regulations. *Id*. at 923. The plaintiff contended that the regulation was invalid based upon two reasons. *Id*. First, that the "Salzmann Assessment is antiquated and never was intended for determinations of medical necessity," and second, that "the 'savings clause' in the second and third prongs of the regulation are useless because they are circular and impossible for recipients to satisfy." *Id*. The supreme court disagreed and held that the orthodontics regulation was a reasonable utilization control that did not cause enrollees to receive less care than envisioned by § 1396d(r)(3). *Id*. at 924. Critical to the court's holding was the fact that the regulation did not use the Salzmann Index as a "blanket exclusion." *Id*. The court looked to the federal district court decision in *Chappell*, which held that the use of a Salzmann score as a bright line test for denying treatment was in violation of federal medicaid laws. *Id*. at 925 (citing *Chappell*, 834 F. Supp. at 1035). The court further explained its reasoning for upholding Connecticut's regulation as follows:

[A] score of less than twenty-four will not necessarily result in the denial of orthodontic services because the orthodontics regulation provides two opportunities for additional consideration of individual cases.

If the patient scores less than twenty-four points, the analysis proceeds to a second step whereby "the [d]epartment shall consider additional information of a substantial nature about the presence of other severe deviations affecting the mouth and underlying structures. Other deviations shall be considered to be severe if, left untreated, they would cause irreversible damage to the teeth and underlying structures." Regs., Conn. State Agencies § 17-134d-35(e)(1). As the plaintiff points out, the use of the term "other severe deviations" conceivably could be read as limiting the additional information considered in an individual case to deviations *not* already accounted for in the Salzmann Assessment score under the first prong. *See* American Heritage College Dictionary (4th Ed. 2002) (defining "other" as [1] "[b]eing the remaining one of two or more"; [2] "[d]ifferent from that or those implied or specified"/ [3] "[o]f a different character or quality"; and [4] "[a]dditional; extra"). Presuming that the dentist performing the Salzmann Assessment would include in the total score every eligible defect, this process would significantly reduce the efficacy of the second prong as a safety net for the consideration of individual circumstances of recipients who have a genuine medical need for orthodontic treatment that is not reflected in their Salzmann Score. **This result is potentially problematic because the meaningful consideration of recipients' individual circumstances is a key factor in the validity of the regulation under the federal EPSDT statutes and regulations**. . . **Thus, to keep the second prong of the regulation from falling into fatal conflict with the federal EPSDT statutes and regulations, we read the second prong of the regulation as requiring the department to consider "additional information of [a] substantial nature about the presence of [*any*] severe deviations affecting the mouth and underlying structures," regardless of whether they were included in the Salzmann Assessment under the first prong.**

*Id*. at 926-27 (footnotes omitted) (emphasis added). The court went on to state that allowing this individualized analysis "permits orthodontic treatment that ordinarily might be cosmetic, and not medically necessary for the malocclusion or deformity by itself, if the dental problem is causing the recipient mental health problems." *Id*. at 928.

The *Semerzakis* decision, like *Chappell*, emphasizes the need for an individualized review of the enrollee's medical condition. The court's focus in *Semerzakis* was on the

reconsideration of factors that were included in the initial assessment of the Salzmann Index score *and* additional factors, such as an enrollee's medical health, that may require orthodontic braces as a medical necessity.

With these cases in mind, we now turn to the TennCare regulations and their application to Petitioner's request for orthodontic braces. Petitioner contends that TennCare's regulations, which restrict orthodontic treatment to solely when a handicapping malocclusion is present violates the federal regulations and the "broad scope" of the EPSDT program. We believe *Semerzakis* provides the most guidance for us in this action. In *Semerzakis*, the court upheld Connecticut's regulations, which had restrictions, because they provided the ability for an individualized review of the enrollee's condition, without regard to the child's Salzmann Index score. *Semerzakis*, 873 A.2d at 927. *Chappell* and *Semerzakis* make it clear, to satisfy the federal statutes, a state must provide for individualized review of the enrollee's condition to determine if there is a medical necessity for orthodontic braces. *Semerzakis*, 873 A.2d at 927 (citing *Jacobus v. Dep't of PATH*, 857A.2d 785,790-92 (Vt. 2004); *Chappell*, 834 F. Supp. at 1034). This is further emphasized in the federal judicial consent decree in *John B. v. Menke*, in which the State of Tennessee was a party defendant, which expressly provides that "services shall be required to be provided based upon each child's individual needs." *John B. v. Menke*, No. 98-0168, Consent Decree for Medicaid-Based Early and Periodic Screening, Diagnosis and Treatment Services (M.D. Tenn. Mar. 11, 1998).[8]

We first note that the TennCare regulation in place at the time of Petitioner's denial of braces did not provide for individualized review.[9] In fact, the language of the regulation in place at the time of Petitioner's denial made it clear that the Salzmann Index score must be at least 28 in order for an enrollee to qualify for orthodontic treatment, which both the administrative law judge and the chancery court determined. As the persuasive case law in *Chappell*, *Semerzakis*, and *Jacobus* makes clear, the use of the Salzmann Index as a bright line determination for orthodontic treatment under the EPSDT program violates federal law because it does not comply with the requirement for individualized review of an enrollee's condition.

TDFA contends that despite the language of the regulation, the manner in which the Salzmann Index was used to determine whether orthodontic treatment for Petitioner was

---

[8]Available at http://www.state.tn.us/tenncare/forms/johnb031198.pdf.

[9]The current version of the regulation does allow for individualized review regardless of the enrollee's score on the Salzmann Index with the addition of the following language: "In addition, individual consideration will be applied for those unique orthodontic cases that may not be accounted for solely by the Salzmann Index." Tenn. Comp. R. & Reg. 1200-13-13-.04(b)5.

medically necessary was "legally correct" because Petitioner was provided with three "individualized reviews" performed by dental benefits reviewers. TDFA further contends that its regulations comply with the recommendation in *Chappell v. Bradley*, by considering not only an enrollee's Salzmann Index score but also considering individual characteristics set forth in the definition of handicapping malocclusion, Tenn. Comp. R. & Regs. 1200-13-13-.01(39). Thus, while the language of the regulation itself may not require an individualized review, TennCare points to the testimony of Dr. Berkon at the contested case hearing, in which he stated that the Salzmann Index score is the least important factor for deciding whether orthodontic braces are medically necessary and that he looks first to other factors such as whether there are overbites, crossbites, or conditions that would cause pain or difficulty eating to determine if there was a medically necessity for orthodontic treatment. TDFA also argues that its regulation's restriction of coverage to a handicapping malocclusion is a "reasonable utilization control" as the court held in *Semerzakis*. However, TDFA argues the chancery court appropriately determined that the issue of whether the Salzmann Index score is being used as a reasonable utilization control was irrelevant because Dr. Berkon made an individualized determination of Petitioner's condition.

TDFA contends that Rachel was afforded three individualized reviews to determine her eligibility. We disagree with this contention. From the record, it is apparent that the first two "reviews" were only to determine her Salzmann Index score and such reviews do not qualify as individualized assessments under the federal guidelines. The first two assessments were stamped "Salzmann Score Does Not Qualify," which does little to persuade us that the Salzmann Index score was not being used as the threshold determination for coverage. It was not until the third review, performed by Dr. Berkon, that a thorough, individualized review was performed. At the contested case hearing, Dr. Berkon testified that he did take into consideration other factors besides the Salzmann Index score, albeit these factors were solely in relation to whether Petitioner had a handicapping malocclusion as defined by the TennCare regulations.

Thus, while an individualized review was performed, the review was still restricted by the definition of handicapping malocclusion within the TennCare regulations. Petitioner contends that this restriction violates the federal statutes and the EPSDT program, because it prevents an enrollee from receiving treatment until a "handicapping" condition is present, which goes against the preventive thrust of the EPSDT program. TennCare's regulations, especially the definition of a severe handicapping malocclusion, are much more restrictive than the regulation at issue in *Semerzakis*. The Connecticut regulation provided that "the [d]epartment shall consider additional information of a substantial nature about the presence of other severe deviations affecting the mouth and underlying structures" in cases where the enrollee scored less than the required threshold amount on the Salzmann Index. In contrast, the TennCare regulation requires a handicapping malocclusion for treatment and it appears

that the only additional information that may be considered would be information relating to the three criteria set forth in the definition of handicapping malocclusion at Tenn. Comp. R. & Reg. 1200-13-13-.01(39).

We also note that Tenn. Comp. R. & Reg. 1200-13-13-.01(39) places restrictions on the individualized review by requiring that the request for braces must be preceded by a request for other services and that progress notes to that effect are also required. Therefore, it would appear that a dentist conducting an individualized review would not be permitted to recommend braces if "progress notes" were not available.[10]

Despite concerns arising from what may be impermissible documentary hurdles in some cases, that does not appear to be the case here. The facts of this case as found by the administrative judge indicate that Dr. Berkon did consider the totality of the information available regarding Rachel's condition and that Dr. Berkon determined that orthodontic treatment was not medically necessary to treat occasional pain arising from eating. The reason for the request for braces in this case falls within subsection (a) of the definition of handicapping malocclusion and Dr. Berkon determined this was not severe enough to constitute a handicapping malocclusion; thus, braces were not medically necessary.[11]

We have therefore concluded, based upon a thorough review of the facts before us, that the denial of coverage in this case was not in violation of the federal statutes and regulations governing the EPSDT program because an individualized review of Rachel's condition was performed by Dr. Berkon, who determined that orthodontic braces were not medically necessary.

---

[10]We also note the difference between the Connecticut regulation, which allows for treatment if it would "significantly ameliorate the problems" versus the TennCare regulation, which provides orthodontic treatment is only available if the condition is non-responsive without it. *See* Tenn. Comp. R. & Regs. 1200-13-13-.01(39); *Semerzakis*, 873 A.2d at 927-28.

[11]Petitioner did not contend that the decision was unsupported by material evidence, though she did challenge the weight given to the opinion of Dr. Hight, her orthodontist, at the contested case hearing. While we have some concerns regarding the TennCare regulations requirement of physician progress notes regarding so-called "anecdotal evidence" of a condition, which may appear to be an impossible hurdle for children in state custody to overcome, we cannot say that based upon the facts presented at the contested case hearing, there was not substantial and material evidence to support the decision.

### IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the Appellant.

_____
FRANK G. CLEMENT, JR., JUDGE